Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | MATTHEW F. KENNELLY | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| CASE NUMBER | 02 C 3614 | DATE | 6-5-03 |
| CASE TITLE | Nedrick Hardy Sr., #B-50437 vs. Internal Affairs Dept., et al. | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
     ☐ FRCP4(m)   ☐ General Rule 21   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] For the reasons set forth in the accompanying Memorandum Opinion and Order, the defendants' respective motions for summary judgment (docket nos. 43 and 46) are granted. The plaintiff's cross-motions for summary judgment (docket nos. 49 and 51) are denied. The defendant Miller's motion to strike the plaintiff's surreply (docket #53) is denied as moot. The Clerk is directed to enter judgment in favor of the defendants. The case is terminated. The parties are to bear their own costs.

| | No notices required, advised in open court. | | | |
|---|---|---|---|---|
| | No notices required. | | number of notices | Document Number |
| | Notices mailed by judge's staff. | | JUN 1 0 2003 | |
| | Notified counsel by telephone. | | date docketed | |
| ✓ | Docketing to mail notices. | | | 56 |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | |
| | Copy to judge/magistrate judge. | CLERK | | |
| mjm | courtroom deputy's initials | 03 JUN -9 PM 4:25 | date mailed notice | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

# IN THE UNITED STATES DISTRICT COURT
# FOR THE NORTHERN DISTRICT OF ILLINOIS
# EASTERN DIVISION

| | | |
|---|---|---|
| NEDRICK J. HARDY SR., #B-50437 | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) NO. 02 C 3614 | |
| | ) | |
| Dr. E.P. AGUINALDO and | ) | |
| BARBARA MILLER, | ) | |
| | ) | |
| Defendants. | ) | |

DOCKETED
JUN 1 0 2003

## MEMORANDUM OPINION AND ORDER

MATTHEW F. KENNELLY, District Judge:

Plaintiff Nedrick Hardy, a state prisoner, has brought this *pro se* civil rights action pursuant to 42 U.S.C. § 1983 against Dr. Euaristo Aguinaldo and Barbara Miller.[1] Hardy claims that the defendants, health care providers at the Stateville Correctional Center, violated Hardy's constitutional rights by acting with deliberate indifference to his serious medical needs. More specifically, Hardy alleges that medical attention for a broken hand was denied or delayed and that he was denied adequate treatment for a severe stomach ailment. This matter is before the Court for consideration of the parties' cross-motions for summary judgment. For the reasons set forth in this order, the Court grants summary judgment in favor of the defendants.

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986). In

---

[1] The claims against various other defendants were previously dismissed.



determining whether factual issues exist, the Court must view all the evidence and draw all reasonable inferences in the light most favorable to the non-moving party. *Walker v. Northeast Regional Commuter Railroad Corp.*, 225 F.3d 895, 897 (7th Cir. 2000). However, Rule 56(c) "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. "Where the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.'" *Chiaramonte v. Fashion Bed Group, Inc.*, 129 F.3d 391, 393 (7th Cir. 1997).

**Facts**

The defendants have each filed statements of uncontested material facts pursuant to Local Rule 56.1. Together with their summary judgment motions, both defendants served on Hardy the required notice under Local Rule 56.2, advising Hardy what he needed to do to contest the motion, and specifically what he needed to do to dispute the defendants' statements of uncontested facts. Despite this, Hardy has not submitted a statement of contested facts; he simply disputes certain facts or elaborates on events in his opposing briefs. Unsupported statements in a brief are not evidence and cannot be given any weight. *See, e.g., Johnson v. Spiegel, Inc.*, No. 02 C 0680, 2002 WL 1880137, at *4 (N.D. Ill. Aug. 15, 2002) (Pallmeyer, J.), citing *In the Matter of Morris Paint and Varnish Co.*, 773 F.2d 130, 134 (7th Cir. 1985).

Nevertheless, because Hardy is proceeding *pro se*, the Court will consider the factual assertions he makes in his brief, but only to the extent that Hardy could properly testify about the matters asserted. Among other things, a witness may not testify to a matter unless evidence is

2

introduced sufficient to support a finding that the witness has personal knowledge of the matter. Fed. R. Evid. 602. It should additionally be noted that the validity of medical records and entries in the medical records cannot be disputed in the absence of any contrary evidence. *Moss v. Morman*, No. 99 C 3571, 2001 WL 1491183, at *4 (N.D. Ill. Nov. 26, 2001) (Andersen, J.)

The Court therefore finds that the following facts, gathered from the parties' submissions, are undisputed for purposes of this motion. Hardy has been confined at the Stateville Correctional Center at all times relevant to this lawsuit. (Complaint, p. 2, Part I, "Plaintiff(s)" section.) Defendant Barbara Miller is the administrator of Stateville's health care unit. (*Id.*, Part II, "Defendant(s)" section.) Defendant Euaristo Aguinaldo is a staff physician at Stateville. (*Id.*)

On May 23, 2001, Hardy injured the middle finger of his left hand while attempting to pry open a property box. (Complaint, p. 6.) Hardy showed his swollen hand to a correctional officer. (*Id.*) The officer surmised, based on the amount of swelling, that Hardy's hand was broken. (*Id.*) The officer called a sergeant, who promised to send someone from the health care unit to look at Hardy's hand. (*Id.*) But no one from the health care unit visited Hardy that day or night. (*Id.*)

The next morning, Hardy showed his hand to a medical technician who was making his daily rounds. (*Id.*) The medical technician told Hardy he would be x-rayed that morning, but Hardy was not called to the health care unit until the early afternoon. (*Id.*) Hardy saw Dr. Aguinaldo at around 12:50 p.m. (*Id.*; Defendant Aguinaldo's Exhibit D, Affidavit of Euaristo Aguinaldo, ¶ 4.)

When Dr. Aguinaldo examined Hardy, he noted that there was slight swelling of the finger. (*Id.*). Dr. Aguinaldo ordered an x-ray, prescribed two Tylenols every four to six hours for

3

ten days, and had Hardy wait for the results of the x-ray. (*Id.*).

The x-ray results reflected "an old chip fracture" at the base of the proximal phalanx, left middle finger. (*Id.*, ¶ 5; *see also* Defendant Aguinaldo's Exhibit C, Medical Progress Notes of May 23, 2001.) Dr. Aguinaldo diagnosed a sprained finger and ordered that a nurse or CMT, "whoever was first available," apply a finger splint to Hardy's middle finger. (Aguinaldo Affidavit, ¶ 5.) The last instruction Dr. Aguinaldo gave to the support staff in the health care unit was to apply a splint to Hardy's finger before he was sent back to his cellhouse. (*Id.*, ¶ 6.)

No one in the health care unit applied a splint or cast. (Defendant Aguinaldo's Exhibit E, Deposition of Nedrick Hardy, at p. 16.) According to Hardy, several different medical technicians and correctional officers told him that he had to see Internal Affairs before he could get a splint for his sprained finger. (*Id.*, pp. 16, 19-20, 32.)

Dr. Aguinaldo apprised the Internal Affairs department of Hardy's injury, as required when an inmate is injured under unusual or suspicious circumstances. (Aguinaldo Affidavit, ¶ 6.) However, Dr. Aguinaldo denies that he stopped or delayed treatment as a result of any internal affairs investigation. (*Id.*)

Later the same day, Hardy complained to a certified medical technician that he had not received any Tylenol or splint. (*Id.*, ¶ 7; Medical Progress Notes of May 24, 2001; Hardy Deposition, p. 17.) After checking Hardy's medical records in the health care unit, the CMT splinted the left middle finger, applied warm compresses, and provided him with Tylenol. (*Id.*, pp. 17-18, 102.) No one from Internal Affairs ever contacted Hardy. (*Id.*, p. 20.)

On June 14, 2001, Hardy returned to the health care unit, complaining of continued pain and swelling. (Aguinaldo Affidavit, ¶ 8; Medical Progress Notes of June 14, 2001.) The tape

4

had come off by that time, so Hardy was no longer wearing the splint. (Hardy deposition, p. 25.) Dr. Aguinaldo noted that Hardy was alert and in no distress; he detected no swelling. (Aguinaldo Affidavit, ¶ 8.) Though Dr. Aguinaldo observed no swelling or tenderness, Hardy expressed pain on dorsiflexion (that is, when he bent his finger back). (*Id*; Medical Progress Notes of June 14, 2001.) Dr. Aguinaldo again prescribed Tylenol and, because Hardy did not have a splint on his left hand when he returned to the health care unit, his finger was again splinted. (*Id.*) This time, a "splint cast" was applied. (Hardy Deposition, p. 26.) Dr. Aguinaldo tried to explain to Hardy that he needed only a splint and not a cast. (*Id.*, pp. 26-27, 103.) He directed Hardy to return to the health care unit as needed and instructed him not to play basketball for eight to ten weeks (Hardy had apparently re-injured his finger playing basketball). (Aguinaldo Affidavit, ¶ 8; *see also* Medical Progress Notes of June 14, 2001.)

On June 26, 2001, Hardy went to the health care unit for treatment of back pain and acid reflux. (Aguinaldo Affidavit, ¶ 9.) Hardy made no mention of any problems with his finger. (*Id.*) He removed the second splint on his own on July 4, 2001 because his finger felt better. (Hardy Deposition, pp. 36-37.) Hardy made no more complaints about his finger until September, when he began experiencing pain and swelling once again. (Hardy Deposition, pp. 30-31, 37.) Hardy believes that his finger has healed properly. (*Id.*, p. 43.)

When Hardy complained of a burning sensation in his stomach on June 26, 2001, Dr. Aguinaldo noted that he had a history of acid reflux, which had been diagnosed as such prior to Hardy's transfer to Stateville. (Aguinaldo Affidavit, ¶ 9; Hardy Deposition, pp. 46-47.) Dr. Aguinaldo examined Hardy and detected "normal bowel sounds". (Aguinaldo Affidavit, ¶ 9.) He nevertheless ordered an upper gastrointestinal (GI) x-ray to rule out gastritis and prescribed

Tagamet, a medication commonly used in treatment of ulcers and gastroesophageal reflux. (*Id.*; *Physicians' Desk Reference*, 57th Edition (2003), at p. 1646.) Hardy had specifically told the doctor that prior to his transfer to Stateville, Tagamet had worked well for him. (Complaint, p. 11.) (*Id.*)

The Tagamet continued to help alleviate Hardy's symptoms during the time period in question. (Hardy Deposition, pp. 50-52.) For unknown reasons, Hardy did not begin receiving Tagamet until about two weeks after Dr. Aguinaldo had prescribed it. (*Id.*, p. 61.) But Hardy faults the medical technicians for the omission and admits that he never contacted Dr. Aguinaldo about the problem. (*Id.*, pp. 61-63.)

The upper GI x-ray was performed on July 19, 2001. (Aguinaldo Affidavit, ¶ 10.) The results were negative for gastritis. (*Id.*)

On July 30, 2001, Hardy requested that the Tagamet prescription be renewed because he continued to suffer heartburn. (*Id.*, ¶ 11.) A Dr. Ngu (another staff physician at Stateville not named as a defendant in this lawsuit) renewed Hardy's prescription for Tagamet and also prescribed Zantac, another medication used to control gastric problems. (*Id.*; Hardy Deposition, p. 56.)

On September 5, 2001, Hardy complained that he was experiencing pain in his left middle finger when he made a fist. (Aguinaldo Affidavit, ¶ 12.) Hardy was "alert and in no distress," and Dr. Aguinaldo noted no swelling, tenderness or pain. (*Id.*) Although Dr. Aguinaldo's findings were that Hardy had a "clinical normal left middle finger," he requested another x-ray of the finger. (*Id.*) The x-ray report revealed no new injury, only the old fracture. (*Id.*, ¶ 13.) On that visit, Hardy made no complaints of heartburn or stomach pain. (*Id.*)

On September 9, 2001, Hardy's psychiatrist, Dr. Stampey, ordered a blood test. (Hardy Deposition, p. 69.) After reviewing the results of the blood test, Stampey informed Hardy that he had tested positive for *helicobacter pylori*. (*Id.*, p. 70; *see also* Exhibit C, Genesis Clinical Laboratory Report of September 7, 2001.) According to the complaint at p. 12, *H. pylori* is a bacterial infection that affects the stomach lining. Dr. Stampey promised to report the test results to Dr. Aguinaldo. (Hardy Deposition, p. 70.)

On October 9, 2001, Hardy went to the health care unit complaining of stomach cramps. (Aguinaldo Affidavit, ¶ 14.) Upon reviewing Hardy's medical chart, Dr. Aguinaldo discovered that Stampey had ordered the "routine" blood test and that Hardy had tested positive for *H. pylori*. (*Id.*) Because the lab results had been placed in Hardy's medical charts rather than directed to Dr. Aguinaldo, the doctor was unaware of the lab test prior to Hardy's next visit to the health care unit. (*Id.*) On reviewing Hardy's charts and reading the lab report, Dr. Aguinaldo prescribed Amoxicillin and Flagyl, the "recommended regime [sic] of antibiotics" for *H. pylori*. (*Id.*, ¶ 15.) The proper course and treatment for *H. pylori* is a regimen of daily antibiotics for a two-week period. (*Id.*, ¶ 24.) Dr. Aguinaldo also prescribed Pepto Bismol as needed, along with Tagamet twice a day. (*Id.*, ¶ 15.)

According to Dr. Aguinaldo, it is unnecessary to run follow-up blood tests in connection with the discovery of the bacterial infection *H. pylori*. (*Id.*, ¶ 25.) If a patient has no further complaints after the course of medication has been completed, it is safe to assume that the antibiotic treatment was effective. (*Id.*) Dr. Aguinaldo specifically directed Hardy to schedule an appointment after two weeks of taking antibiotics; Hardy did so and on his return visit to the health care unit on October 25, 2001, he had no further complaints of stomach cramping or pain.

(*Id.*, 26.) As a result, Dr. Aguinaldo adjudged that no further treatment was necessary at that time. (*Id.*) Dr. Aguinaldo did not see Hardy again until February 2002. (*Id.*, ¶ 17.)

On November 8, 2001, Hardy went to the health care unit claiming that he had injured another finger while playing basketball. (*Id.*, ¶ 18.) Dr. Ngu attended to the injury. (*Id.*) Hardy made no complaints of stomach pain or cramps at that time. (*Id.*)

On December 13, 2001, Dr. Ngu examined Hardy again, this time with regard to the his report that he had been poked in the eye and was having blurred vision. (*Id.*, ¶ 19.) Dr. Ngu prescribed Tylenol and referred Hardy to the optometry clinic. (*Id.*) Hardy made no complaints of stomach pain or cramps at that visit. (*Id.*)

On December 14, 2001, Hardy requested to see a doctor because he had blood in his stool. (*Id.*, ¶ 20.) Dr. Ngu prescribed a course of the antibiotics Amoxicillin and Biaxin (antibiotics) for two weeks. (*Id.*) He also ordered a lower GI x-ray to rule out gastrointestinal bleeding. (*Id.*) Hardy refused the x-ray. (*Id.*, ¶ 22; Hardy Deposition, pp. 84-85.) Hardy's medical records reflect no further complaints of stomach pain, cramping or other intestinal ailments after December 15, 2001. (Aguinaldo Affidavit, ¶ 23.) Hardy admits that the *H. pylori* "cleared up" after the second round of medication. (Hardy Deposition, p. 84.) He occasionally still suffers from acid reflux, but he takes Tagamet when he experiences stomach problems. (*Id.*, p. 85.)

Dr. Aguinaldo had occasion to see Hardy again on February 12, 2002, when Hardy complained that he had pain and swelling in his left hand as a result of a fight he had been in five days earlier. (*Id.*, ¶ 17.) Dr. Aguinaldo ordered an x-ray, which revealed no broken bones. (*Id.*)

Hardy filed a number of grievances complaining about the quality of his medical care

during the time period in question. (*See* exhibits to complaint and to Hardy's brief opposing Miller's first motion for summary judgment.) None of Hardy's grievances mentioned the defendant Miller. (*Id.*) Miller states that she has no personal knowledge of Hardy's medical complaints underlying this action, nor any involvement in his medical care. (Affidavit of Barbara Miller, attached to her Statement of Uncontested Facts, ¶ 2.) Medical care is provided by on-site health care staff and outside specialists. (*Id.*) Miller is merely an administrator; she has no medical license and no personal involvement in providing individual inmate medical treatment. (*Id.* at ¶¶ 1 and 2.) Medical care is overseen by Stateville's medical director, a licensed physician. (*Id,* ¶2.) Had Miller received any complaints from Hardy about inadequate medical treatment, she says, she would have referred the matter to the medical director and/or the attending physician. (*Id.* at ¶ 3.) Miller says that she never personally handled nor was she aware that Hardy had filed grievances concerning his medical care. (*Id.*) She states that she has never denied or directed anyone else to deny Hardy medical treatment. (*Id.* at ¶ 4.)

## Discussion

1. **Claims against Dr. Aguinaldo**

    a. **Sprained finger**

It is well settled that a prison health care provider's deliberate indifference to an inmate's serious medical condition violates the Eighth Amendment. *Farmer v. Brennan*, 511 U.S. 825, 837 (1994); *Estelle v. Gamble*, 429 U.S. 97, 103-04 (1976); *Sherrod v. Lingle*, 223 F.3d 605, 610 (7th Cir. 2000). Deliberate indifference has both an objective and a subjective element: the inmate must have an objectively serious medical condition, and the health care provider must be subjectively aware of and consciously disregard a risk to the inmate's health or safety. *Farmer,*

9

511 U.S. at 837; *Sherrod*, 223 F.3d at 610.

The record reveals that Hardy suffered only a sprained finger, not a broken hand or finger as he alleged in his complaint. Hardy continues to maintain that he suffered a broken hand; he asserts, "Plaintiff Hardy was told by the x-ray tech personally that his hand was broken. . . ." But the medical progress notes for May 23, 2001, indicate "Sprain" and the x-ray report dated May 29, 2001, indicates "**Old** chip fx̄ base of prox. phalanx middle finger" (emphasis added). The Medical Progress Notes of June 11, 2001, likewise refer to an "old" chip fracture. *See also* X-ray reports of September 18, 2001 ("No new path[ology]; old fx̄ base") & November 13, 2001 ("Swelling; no fracture seen"). There is no competent evidence to support Hardy's assertion that his hand was broken, only hearsay from a medical technician. The record does not support a finding that Hardy had a broken hand or finger.

Assuming that Hardy's sprained finger amounted to a "serious" medical need, Dr. Aguinaldo did not act with deliberate indifference. There is no dispute that he examined Hardy's hand, ordered an x-ray, prescribed Tylenol and, after reviewing the results of the x-ray, directed that a splint be applied. It is unfortunate that a splint was not applied until that evening or the next day, when Hardy alerted a medical technician that he still needed a splint. But that oversight cannot be attributed to Dr. Aguinaldo, who specifically directed his staff to apply a splint; moreover, even if Dr. Aguinaldo was responsible for the delay, there is no evidence from which a reasonable jury could find that he had a culpable state of mind.

Hardy's claim that he was "denied" care between May 23, 2001, and June 14, 2001, mischaracterizes the sequence of events. After a one-day delay, a splint was applied. Hardy apprised a medical technician of the problem, and the matter was promptly rectified. Hardy

cannot dispute the medical records–and his own deposition testimony–that his finger was splinted on May 24, 2001. Hardy seems to confuse a cast and a splint; he conceded in his deposition that a CMT applied a tongue depressor and wrapped his finger in gauze on that date (Hardy Deposition, p. 17), but he still maintains that he did not receive a splint until June 14, 2001. The tongue depressor and wrap were, in fact, a splint even though the dressing may have seemed makeshift to Hardy.

In any event, Hardy admits that he has no reason to believe that Dr. Aguinaldo was at fault for any lack of treatment from May 23, 2001, to June 14, 2001. (*See* Hardy Deposition, pp. 32, 36.) Rather, Hardy believes that someone in Internal Affairs directed that treatment be withheld. (*Id.*) However, he provides no evidence to support his belief. Dr. Aguinaldo admits that he reported the suspicious injury to Internal Affairs, as required by prison regulations, but he emphatically denies that an internal affairs investigation did or would prevent an inmate from receiving needed medical treatment.[2]

The evidence regarding Hardy's follow-up care further belies any inference that Dr. Aguinaldo was deliberately indifferent to his medical needs. On June 14, 2001, Hardy returned to the health care unit after he re-injured his finger playing basketball. Dr. Aguinaldo again prescribed Tylenol and, because Hardy no longer had a splint on his left hand when he returned to the health care unit, another splint (or "splint cast") was applied. Dr. Aguinaldo directed Hardy to return to the health care unit as needed. Hardy's finger felt sufficiently recovered that

---

[1] In allowing Hardy to proceed on his claims, the Court noted, "After conducting discovery, the plaintiff may wish to file an amended complaint naming the specific internal affairs investigators who purportedly barred him access to the medical unit." *See* Minute Order of June 3, 2002. But Hardy has never identified any such person; indeed, he concedes in his brief opposing summary judgment that no one from Internal Affairs ever contacted him.

11

he removed the splint on his own on or about July 4, 2001. (Hardy deposition, p. 36.) Dr. Aguinaldo did not have occasion to see Hardy again about the injured finger until September 2001, at which time he made a clinical finding that Hardy's finger was "normal." Dr. Aguinaldo nevertheless ordered a repeat x-ray, which also proved negative. Hardy believes that ultimately, his finger fully healed. (*Id.*, p. 43.)

There is no evidence that Hardy ever requested or was denied medical attention from Aguinaldo or anyone else between visits to the health care unit. Nor was Hardy constitutionally entitled to see an orthopedic specialist for examination of a sprained finger, a simple injury adequately treated by a general practitioner under most circumstances. Under these circumstances, the Court must defer to the judgment of Hardy's treating physician that referral to an orthopedic specialist was "not indicated." (*See* unmarked exhibit to Hardy's brief opposing summary judgment, counselor's response, dated November 16, 2001; *see also* Hardy Deposition, at pp. 34-35: "I just thought, I don't know; I probably didn't hear [Aguinaldo] right, I'm not sure [about being referred to ortho"].) Hardy received constitutionally adequate medical care for his injured finger. He cannot recover damages for non-receipt of medical treatment when he did not need or seek medical treatment during the period in question.

### b.  Stomach ailment

The Court will assume for purposes of the parties' motions that Hardy's *helicobacter pylori* infection constituted a "serious" medical condition, as he contends it caused him sharp pain, burning and cramps. *See Sherrod*, 223 F.3d at 610 (inflamed appendix was objectively serious); *Zentmeyer v. Kendall County*, 220 F.3d 805, 810 (7th Cir. 2000) (an ear infection, though a "common malady," could be deemed objectively serious where it "inflicted prolonged

suffering" and required extensive treatment); *Gutierrez v. Peters*, 111 F.3d 1364, 1373 (7th Cir. 1997) (a condition is objectively serious if "failure to treat [it] could result in further significant injury or unnecessary and wanton infliction of pain").

Dr. Aguinaldo is nevertheless entitled to summary judgment because there is no evidence he acted with deliberate indifference to Hardy's medical problem. When Dr. Aguinaldo first saw Hardy in relation to his complaints of stomach problems, the doctor noted that Hardy had a history of heartburn and had previously been diagnosed as suffering from chronic acid reflux. Dr. Aguinaldo examined Hardy and detected "normal bowel sounds," but he ordered an upper GI x-ray to rule out gastritis. He also prescribed Tagamet, a medication Hardy specifically requested because it had always helped his condition. (Hardy deposition, pp. 50-52.) Although the complaint mischaracterizes Dr. Aguinaldo's actions as amounting to withholding of treatment, Hardy's medical records refute any such inference. Hardy concedes that, to his knowledge, Dr. Aguinaldo was unaware of the two-week lapse between his ordering Tagamet and the prescription's being filled.

Dr. Aguinaldo's initial misdiagnosis of the problem did not reflect such substandard care as to rise to the level of an Eighth Amendment violation. Neither simple medical malpractice, *Steele v. Choi*, 82 F.3d 175, 178-79 (7th Cir. 1996), nor mere dissatisfaction with a doctor's prescribed course of treatment, *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996), is actionable under 42 U.S.C. § 1983. Erroneous treatment implicates the Constitution only when the health care provider's conduct reflects a substantial departure from accepted medical judgment, practice, or standards. *Sherrod*, 223 F.3d at 611; *Vance v. Peters*, 97 F.3d 987, 992 (7th Cir. 1996). Given Hardy's history of acid reflux and his specific request for Tagamet, Dr.

Aguinaldo's course of treatment did not reflect reckless disregard, especially when he ordered an upper GI x-ray to help determine the source of the problem.

The fact that at least one other physician, Dr. Ngu, took the same approach as Dr. Aguinaldo, renewing the Tagamet prescription, further weakens any claim that Dr. Aguinaldo's response to Hardy's stomach complaints was so inadequate as to reflect "an absence of professional judgment." *See Collignon v. Milwaukee County*, 163 F.3d 982, 989 (7th Cir. 1998). Mere disagreement over what the best treatment plan might have been is not actionable under the Constitution. *Id.* It is unfortunate that Hardy continued to suffer his stomach ailment until Dr. Stampey ordered an additional test; however, the question of whether a certain diagnostic technique or form of treatment should be prescribed "is a classic example of a matter for medical judgment" that is not actionable under the Constitution. *Estelle v. Gamble*, 429 U.S. 97, 107 (1976). Deliberate indifference may be inferred based upon erroneous medical treatment only when the medical professional's decision is such a substantial departure from accepted professional judgment, practice, or standards as to demonstrate that the person responsible did not base the decision on such a judgment. *Estate of Cole v. Fromm*, 94 F.3d 254, 261-62 (7th Cir. 1996).

There is no dispute that Dr. Aguinaldo prescribed the standard antibiotic regimen once he learned that Hardy had tested positive for *H. pylori*; Hardy concedes that the condition cleared up after a second round of antibiotics was prescribed. Dr. Aguinaldo also prescribed Pepto Bismol and Tagamet to alleviate Hardy's symptoms until the antibiotics took effect.

There is no basis in the record to question Dr. Aguinaldo's assertion that it is unnecessary to run follow-up blood tests in connection with the discovery of the bacterial infection *H. pylori*.

According to Dr. Aguinaldo, if a patient has no further complaints after the course of medication has been completed, it is safe to assume that the antibiotic treatment was effective. Hardy was no stranger to the health care unit, as evidenced by his medical records reflecting appointments for his myriad health concerns; he was aware that he could contact the medical staff had he experienced any problems with the antibiotics. On October 25, 2001, when Hardy returned to the health care unit for a follow-up appointment two weeks after beginning antibiotics, he registered no further complaints of stomach cramping or pain.

In sum, Hardy's claim that Dr. Aguinaldo denied Hardy necessary medical care is wholly unsupported by the record. Even viewing the evidence in the light most favorable to Hardy, no reasonable person could infer that Dr. Aguinaldo acted with deliberate indifference.

### 2. Claims against Barbara Miller

Hardy has provided no evidence of defendant Barbara Miller's direct, personal involvement in any alleged denial of medical care, as required to sustain a claim against her under §1983. *See, e.g., Gentry v. Duckworth*, 65 F.3d 555, 561 (7th Cir. 1995). Hardy has also failed to provide evidence that the alleged violations of his constitutional rights occurred at Miller's direction or with her knowledge and consent. *Id.* "Section 1983 creates a cause of action based on personal liability and predicated upon fault; thus, liability does not attach unless the individual defendant caused or participated in a constitutional deprivation." *Vance v. Washington*, 97 F.3d 987, 991 (7th Cir. 1996)(citations omitted).

Hardy conceded in his deposition that he sued Miller based solely on her position as health care unit administrator. But the mere fact that Miller is the administrator of the health care unit at Stateville is insufficient to provide a basis for liability in this case. The doctrine of

15

*respondeat superior* (supervisory liability) does not apply to actions filed under 42 U.S.C. § 1983. *See Pacelli v. DeVito*, 972 F.2d 871, 877 (7th Cir. 1992). As Miller explains in her affidavit, she had no personal knowledge of the problems underlying this lawsuit, nor any involvement in his medical care. Miller asserts that she did not deny or direct that anyone else deny Hardy medical treatment, and was completely unaware of his grievances. Because Miller does not hold a medical license, she does not provide direct inmate care; her position is administrative in nature. Medical care at Stateville is supervised by the medical director, a licensed physician. Had Miller become aware of any complaints by Hardy concerning inadequate medical care, she would have referred the matter to the medical director and/or the attending physician for appropriate action.

Hardy argues that Miller is either lying about her lack of personal involvement "or else she didn't do her job." But Hardy has provided no evidence supporting his assertion that Miller "has a say in who the Doctor see or doesn't see," or that she was otherwise responsible for any delays or denials of needed care.

Hardy has submitted copies of two memoranda written by the facility's medical director discussing unrelated grievances Hardy filed regarding the quality of his medical care. (*See* Unmarked Exhibits to Hardy's "Opposing Motion for Defendant Barbara Miller's Summary Judgment Motion," Memoranda dated March 20, 2002, and April 24, 2002.) The memoranda reflect that copies were mailed to Miller and six other correctional officers and health care providers. However, those memoranda were sent a year after the events giving rise to this lawsuit and admittedly concern "another complaint that Plaintiff Hardy had." (Hardy's brief opposing Miller's motion for summary judgment at p. 2.) The memoranda are insufficient to

support an inference that Miller was involved in the medical issues underlying this action or aware of Hardy's earlier grievances; to the contrary, they substantiate her assertion that the medical director dealt with inmate grievances. Hardy insists that dealing with grievances is part of Miller's job, but his assertions are neither based on personal knowledge nor supported by any evidence. In sum, Hardy has provided no basis to discount Miller's sworn statements and, more generally, has failed to provide evidence from which a reasonable jury could find that Miller was personally involved in the alleged circumstances giving rise to this lawsuit.

## Conclusion

For the reasons stated above, the Court grants defendants' motions for summary judgment (docket nos. 43 and 46) and denies Hardy's cross-motions for summary judgment (docket nos. 49 and 51). Defendant Miller's motion to strike Hardy's surreply (docket #53) is denied as moot. The Clerk is directed to enter judgment in favor of the defendants. The parties are to bear their own costs.

If the plaintiff wishes to appeal this final judgment, he may file a notice of appeal with this Court within thirty days of the entry of judgment. Fed. R. App. P. 4(a)(4). A motion for leave to appeal *in forma pauperis* should set forth the issues the plaintiff plans to present on appeal. *See* Fed. R. App. P. 24(a)(1)(C); *Hyche v. Christensen*, 170 F.3d 769, 771 (7th Cir. 1999). If the plaintiff does choose to appeal, he will be liable for the $105 appellate filing fee irrespective of the outcome of the appeal. *Evans v. Illinois Dept. of Corrections*, 150 F.3d 810, 812 (7th Cir. 1998). Furthermore, if the appeal is found to be non-meritorious, the plaintiff may be assessed a "strike" under 28 U.S.C. § 1915(g). The plaintiff is cautioned that if a prisoner has had a total of three federal cases or appeals dismissed as frivolous, malicious, or failing to state a

claim, he may not file suit in federal court without prepaying the filing fee unless he is in imminent danger of serious physical injury. *Id.*

                                              MATTHEW F. KENNELLY
                                              United States District Judge

Date:   June 5, 2003